**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ERIK SEARCH, | |
| **Plaintiff,** | |
| v. | Civil Action No. 15-257 (JEB) |
| UBER TECHNOLOGIES, INC. *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION**

For generations, parents have admonished their children not to get into cars with strangers. See, e.g., Forrest Gump (Paramount Pictures 1994) ("Mama said not to be taking rides from strangers."). But in today's "sharing economy," that warning is an anachronism: every day, millions of Americans summon unknown drivers with the press of a button. At the same time, the danger of taking a ride from a stranger has not entirely disappeared. As with other growing pains of twenty-first-century economics, courts must now determine what is to be done about the risk of that old-fashioned danger in a market shaped by new players and new technologies.

Plaintiff Erik Search filed this lawsuit against Uber Technologies, Inc., claiming that it is liable for an alleged knife attack by one of its drivers, Yohannes Deresse. Search has asserted, *inter alia*, claims of negligent hiring, training, and supervision; negligence under *respondeat superior* and apparent-agency theories; and violations of the D.C. Code. Whether Uber is liable for many of these depends on whether it was – or presented itself as – Deresse's employer.

In now moving to dismiss, Uber argues that Deresse was instead merely an independent contractor. It maintains that it "is not a transportation company," but rather "a technology company that acts as a conduit between transportation providers and passengers." Mot. at 1.

1

Search responds that Defendant now seeks to disavow, for its own legal expediency, the promotional language and promises that helped it amass a broad consumer base and multi-billion-dollar valuation – in his view, Uber's is a classic corporate case of trying to have one's cake and eat it, too.   Both sides' rhetoric notwithstanding, the Court concludes that it is premature to decide most of these issues at this time.  This is because, in its Motion to Dismiss, Uber relies predominantly on factual information outside the four corners of Plaintiff's Complaint.  For the reasons that follow, consequently, the Court will deny in large part, and grant in part, Uber's Motion.

## I.      Background

According to the Amended Complaint, which the Court must presume to be true at this stage, Defendant Uber "is a car service that provides drivers to customers on demand through a cell phone application, or 'app,' in cities around the world."  Am. Compl., ¶ 6.  In its app – which is free to download and install on any smartphone – the company markets itself to consumers as "your private driver in more than 50 countries."  Id., ¶¶ 6, 10.

Uber's business model operates as follows: it dictates the fares charged in each jurisdiction in which it operates, collects the appropriate payment from each passenger, and then passes on to its drivers 75-80% of the fares collected while keeping the remaining portion for itself.  See id., ¶ 11.  Notably, "Uber drivers do not collect any form of payment directly from consumers; rather, they receive payment for their work . . . via weekly direct deposit."  Id., ¶ 12.  Drivers are not permitted to set their own fares, accept cash payment from consumers, or retroactively adjust a fare up or down.  See id., ¶¶ 13-14.

Defendant "subjects its drivers," moreover, "to a host of specific requirements concerning the performance of their driving duties."  Id., ¶ 15.  Among other things, the

company demands that its drivers "utilize an app on a phone provided by Uber"; maintain their vehicles in "great" mechanical shape and "acceptably clean" condition; "adhere to Uber's rules regarding tipping," which include refusing tips once and accepting them only on the second offer; sustain an acceptable ride-request-acceptance rate; respond to ride requests within an acceptable timeframe; "display the Uber logo on their vehicles"; and refrain from excessively calling passengers who have requested a ride.  See id.

On September 8, 2013, Plaintiff Erik Search and three of his friends required transportation from 3030 K Street, NW, in the District of Columbia.  See id., ¶ 16.  As he had on multiple past occasions, Search used the Uber app on his phone to request a pick-up at that location.  See id., ¶¶ 16-17.  On that evening, Uber driver Yohannes Deresse accepted Plaintiff's request and arrived shortly thereafter.  See id.

Immediately following the group's entry into the car, Deresse "began to act erratically." See id., ¶ 18.  Uncomfortable with Deresse's behavior, Search and his companions exited the vehicle and began walking away.  See id., ¶¶ 18-19.  According to Plaintiff, Deresse followed them out of the car and began to verbally harass them.  See id., ¶ 19.  In response, Search told the driver "to leave them alone," and that "they did not feel safe riding in an Uber car with him." See id., ¶ 20.

At that point, the verbal dispute escalated into physical violence.  As Search recounts, Deresse pulled out a knife and stabbed him at least six times in his chest and left arm.  See id., ¶¶ 21-22.  Plaintiff sustained severe injuries during the course of the brutal attack, requiring him to undergo "CT scans, x-rays, surgical exploration of the chest wound, diagnostic laparoscopy, cauterization, and muscle reconstruction with sutures and staples."  Id., ¶ 22.  In addition,

Plaintiff suffered "pain, mental anguish, humiliation, and indignity" as a result of the assault. Id., ¶ 23.

Naming Deresse and Uber as Defendants - as well as another entity since dismissed, see ECF No. 15 (Stipulation of Dismissal) - Plaintiff filed suit in D.C. Superior Court, alleging a variety of state-law tort claims and one violation of the D.C. Consumer Protection Procedures Act, codified at D.C. Code § 28-3905(k).  Uber, in turn, removed the suit to federal court on diversity grounds and now moves to dismiss all causes of action lodged against it.  (Deresse has not yet been served.)

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a claim for relief when the complaint "fail[s] to state a claim upon which relief can be granted."  In evaluating a motion to dismiss under Rule 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citation omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (internal quotation marks omitted).  Though a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to

raise a right to relief above the speculative level." Twombly, 550 U.S. at 555-56 (quoting

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

A motion to dismiss under Rule 12(b)(6) must rely solely on matters within the

complaint, see Fed. R. Civ. P. 12(d), which includes statements adopted by reference as well as

copies of written instruments joined as exhibits.  See Fed. R. Civ. P. 10(c).  Where the Court

must consider "matters outside the pleadings" to reach its conclusion, a motion to dismiss "must

be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); see also Yates v.

District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003).  Such conversion is premature,

however, if all parties have not yet had the "opportunity to present evidence in support of their

respective positions."  Kim v. United States, 632 F.3d 713, 719 (D.C. Cir. 2011) (citing Fed. R.

Civ. P. 12(d)).

## III.   Analysis

In the instant Motion, Uber moves to dismiss five of the eight counts in the Amended

Complaint.  The Court analyzes each in turn, after first resolving a threshold procedural issue.

### A.   Conversion to Motion for Summary Judgment

A motion to dismiss under Rule 12(b)(6) must rely solely on facts within the four corners

of the Complaint, and the Court must adjudicate the Motion under the same constraint.  See Fed.

R. Civ. P. 12(d); see also Hawkins v. Boone, 786 F. Supp. 2d 328, 332 (D.D.C. 2011).  Here,

however, Defendants have submitted materials outside the Complaint along with their Motion –

namely, the Declaration of Rachel Holt, see Mot., Exh. 1, and Uber's User Terms and Conditions

(User Agreement).  See id., Exh. B.  As previously mentioned, if a court considers such materials

in resolving a 12(b)(6) motion, it must convert the motion as filed into one for summary

judgment.

Before such a conversion, the Court must "afford[] all parties reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Gordon v. Nat'l Youth Work Alliance, 675 F.2d 356, 360 (D.C. Cir. 1982) (internal quotation marks and citation omitted); see also Mitchell v. E. Sav. Bank, FSB, 890 F. Supp. 2d 104, 108 (D.D.C. 2012) (declining to convert motion to dismiss where doing so "would deny Plaintiff any opportunity in discovery to develop his evidentiary support"). Ultimately, though, the decision "whether to accept extra-pleading matter" and convert the motion to one seeking summary judgment is committed to the discretion of the court. See 5C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1371 (3d ed.); see also Flynn v. Tiede-Zoeller, Inc., 412 F. Supp. 2d 46, 50-51 (D.D.C. 2006).

In this case conversion would be premature, as Plaintiff has not had a meaningful opportunity to present supporting materials outside of his Complaint. Search nonetheless urges the Court to treat Uber's Motion as one for summary judgment and to deny it on the basis that numerous material factual disputes persist despite the materials Defendant has submitted. See Opp. at 8-9. The Court declines the invitation, believing that the more prudent course is to confine its inquiry solely to the allegations in the Complaint. Both sides will have an opportunity to present a fully developed record for summary judgment, if either side subsequently so moves.

B. Count I: Negligent Hiring, Training, and Supervision

In the District of Columbia, employers operating public businesses are generally "bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee." Schecter v. Merchants Home Delivery, Inc., 892 A.2d 415, 431 (D.C. 2006) (quoting Fleming v. Bronfin, 80 A.2d 915, 917 (D.C. 1951)) (internal quotation marks and citation omitted). When an employer has disregarded

6

this duty and "as a result injury is occasioned to a third person," liability may be imputed to the

employer "even though the injury was brought about by the willful act of the employee beyond

the scope of his employment."  Id. (quoting Fleming, 80 A.2d at 917) (internal quotation marks

and citation omitted).  A master-servant relationship need not underlie a claim of negligent

hiring, for an entity may also be liable for the negligent-hiring of an independent contractor.  See

Doe v. Exxon Mobil Corp., 573 F. Supp. 2d 16, 28 (D.D.C. 2008).  Because it is thus irrelevant –

for this count – whether Deresse was an independent contractor or an employee, the Court will

presume he was an employee when analyzing the negligent hiring claim.  The Court similarly

bears in mind that the direct-liability theory of negligent hiring is distinct from negligence based

on the vicarious-liability doctrine of *respondeat superior*; those claims, which Plaintiff also

raises, will be discussed *infra*.

      Plaintiff asserts that Uber "had a duty to use reasonable care in the selection, hiring,

training, and supervision of its employees."   Am. Compl., ¶ 25.  He alleges that it breached that

duty

> by failing to hire personnel properly qualified to operate Uber
> vehicles in a safe and reasonable manner; by failing to properly
> screen potential employees . . . ; by failing to abide by proper
> screening protocols before hiring employees . . . ; by hiring
> dangerous and unstable drivers including Defendant Deresse; by
> failing to provide follow-up, in-service safety training . . . ; by failing
> to terminate Defendant Deresse prior to the incident in question; and
> failing to properly supervise drivers while such drivers are operating
> Uber vehicles.

Id., ¶ 27.  Search furthermore believes that Uber "had actual or constructive notice of [its]

failures to properly hire, train, and supervise their employees," and of "Deresse's dangerous

nature, potential for violence and general unfitness for duty."  Id., ¶ 28.  Indeed, according to

Plaintiff, Uber "knew to a moral certainty" that its drivers "would predictably experience

confrontations with passengers, and that as a result of the failure to properly hire, train, and supervise, criminal attacks o[n] District of Columbia residents would occur." Id.

While Uber does not disagree that it has a duty to take reasonable care in hiring, training, and supervising its drivers, it maintains that Plaintiff's allegations about its negligence in this area are "conclusory assertions . . . devoid of any factual matter." Mot. at 11. The Court agrees.

Generally, "[a]n employer cannot be liable for negligent hiring if the employer conducts a reasonable investigation into the person's background or if such an investigation would not have revealed any reason not to hire that person." Exxon Mobil Corp., 573 F. Supp. 2d at 28-29. Importantly, then, to state a claim for negligent hiring, a plaintiff must allege specific facts from which an inference can be drawn that the employer did not conduct a reasonable background investigation, and that such an investigation would have uncovered a reason not to hire the alleged tortfeasor.

Here, Plaintiff fails to do either. His only factual allegations pertaining to Uber's pre-hiring screening consist of a quote from Uber's promise, on its website, to conduct "a rigorous background check" of "[a]ll Uber ridesharing and livery partners." Am. Compl., ¶ 7. The Complaint excerpts Uber's own explanation of its background investigations, namely:

> The three-step screening we've developed across the United States, which includes county, federal and multi-state checks, has set a new standard. These checks go back 7 years, the maximum allowable by the Fair Credit Reporting Act. We apply this comprehensive and new industry standard consistently across all Uber products . . . . Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving. . . . [O]ur background checking process and standards are . . . often more rigorous than what is required to become a taxi driver.

Id. (quoting "Uber Background Checks," http:// blog.uber.com/driverscreening). Plaintiff does not allege that Uber did not actually conduct a background check consistent with these

procedures prior to hiring Deresse.  Furthermore – and fatally for his claim – Search does not

allege either that these background-investigation procedures were not reasonably calculated to

discover a "red flag" in Deresse's past, or even that any such "red flag" existed.  See Moseley v.

Second New St. Baptist Church, 534 A.2d 346, 349 n.6 (D.C. 1987) (explaining that plaintiff

must establish that employer "knew or should have known of any prior history of or tendency

toward assaults" to make out claim for negligent hiring).

The gravamen of Plaintiff's complaint seems to be that Uber's hiring mechanisms must

have been inadequate if they failed to uncover that Deresse "was emotionally unstable and

unqualified to be a driver, and that he was a danger to the public."  Am. Compl., ¶ 30.  But this

res ipsa loquitur-style logic falls short of the threshold required to survive a Rule 12(b)(6)

motion.  For Search does not allege that any reasonable background investigation would have

uncovered Deresse's emotional instability and poor driving qualifications.  Nor does he identify

any particular measures that Uber did not take that could have prevented the hiring of Deresse.

And the Rule "demands more than an unadorned, the defendant-unlawfully-harmed-me

accusation."  Iqbal, 556 U.S. at 678.

Since Search might contend that he cannot know, absent discovery, precisely what Uber

learned about Deresse at the time of his hiring, it may seem unreasonable to expect the

Complaint to offer a more detailed factual foundation for Plaintiff's negligent-hiring claim.  This

apparent Catch-22 is the reason that "detailed factual allegations are not necessary to withstand a

Rule 12(b)(6) motion," but it does not excuse a Plaintiff's failure to "put forth factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Kenley v. District of Columbia, -- F. Supp. 3d --, 2015 WL 1138274

(D.D.C. March 13, 2015) (internal quotation marks and citations omitted).  Were that not the

case, a plaintiff might merely invoke the magic words – *e.g.*, "negligent hiring," "constructive knowledge," and the like – and thereby subject a defendant to costly and potentially meritless litigation.  In addition, a plaintiff's investigation of an employee before filing suit could demonstrate than an employer <u>did</u> know (or should have known) of the employee's prior malfeasance.

Even reading his allegations in the light most favorable to Plaintiff, as the Court must, the Amended Complaint offers little more than "[t]hreadbare recitals of the elements of" a negligent-hiring claim, "supported by mere conclusory statements."  <u>Iqbal</u>, 556 U.S. at 678.  The Court agrees with Defendant that, at best, Search's allegations are "consistent with" Uber's liability, but fail to push his claims from the possible to the plausible.  <u>Id.</u>

Search's meager allegations pertaining to his negligent-training and -supervision claims are even less robust:  He does not offer any specific allegations about Uber's training and supervision programs, beyond the aforementioned quote from the company's website.  And he does not assert that any particular training or supervisory programs would have prevented the assault alleged here.  As the Court, consequently, need not further consider these claims – indeed, Search essentially ignored them in his Opposition – it will grant Defendant's Motion to Dismiss as to Count I.

C.  <u>Count IV: *Respondeat Superior*</u>

Search's fourth count seeks to hold Uber vicariously liable for Deresse's actions.  It is hornbook law that "[u]nder the doctrine of *respondeat superior*, an employer may be held liable for the acts of his employees committed within the scope of their employment."  <u>Brown v. Argenbright Sec., Inc.</u>, 782 A.2d 752, 757 (D.C. 2001) (quoting <u>Boykin v. District of Columbia</u>, 484 A.2d 560, 561 (D.C. 1984)).  A claim for vicarious liability under a *respondeat superior*

theory consists, therefore, of two prongs: an employer-employee relationship and a tortious act committed by the employee within the scope of his employment.  The Court addresses each in turn.

### 1. Employer-Employee Relationship

The parties agree that in the District of Columbia, the question of whether an employer-employee relationship exists is governed by a five-factor test that examines: (1) involvement in the selection and engagement of the employee; (2) payment of wages; (3) power to discharge; (4) power to control the employee's conduct; and (5) whether the employee's work is part of the regular business of the employer.  See Moorehead v. District of Columbia, 747 A.2d 138, 143 (D.C. 2000); LeGrand v. Insurance Co. of N. Am., 241 A.2d 734, 735 (D.C. 1968).  Under this test, the fourth factor – "the right to control an employee . . . and not the actual exercise of control or supervision" – is usually "the determinative factor."  Moorehead, 747 A.2d at 143 (internal quotation marks and citation omitted).  "Whether a master-servant (or principal-agent) relationship exists in a given situation depends on the particular facts of each case," and here, of course, we must take the facts to be as Plaintiff has alleged them.  Id. (internal quotation marks and citation omitted).

Plaintiff asserts that Deresse was "an employee, agent, and/or servant" of Uber at the time of the incident at issue in this case.  See Am. Compl., ¶ 5.  He alleges a number of facts that, he believes, establish this employer-employee relationship: For instance, Uber screens new drivers, dictates the fares they may charge, and pays such drivers weekly.  See id., ¶¶ 7-12. Search claims that "[u]pon threat of termination, Uber subjects its drivers to a host of specific requirements," including, *inter alia*, the use of the Uber app, standards for the cleanliness and mechanical functioning of their cars, rules regarding tipping, minimum timeframes and

acceptance rates for ride requests, and display of the Uber logo.  See id., ¶ 15.  According to

Plaintiff, these facts establish the first four factors of the aforementioned test.  See Opp. at 12-13.

Search maintains that the fifth factor, whether Deresse's work is part of Uber's regular business,

is satisfied by his allegation that "Uber is a car service" for which Deresse was a driver.  See

Am. Compl., ¶ 6; Opp. at 13.

The Court agrees, for the most part.  The Amended Complaint sets forth facts illustrating

Uber's involvement in the selection process of new drivers (by way of its screening procedures);

payment of wages (by paying drivers weekly rather than permitting them to collect payment or

tips directly from passengers); and termination of employees (by enjoying broad latitude to

terminate employees who fail to comply with the company's standards).  As to the question

whether driving is Uber's regular business, Defendant simply disagrees with Plaintiff's factual

allegation that the company is a "car service."  It does not argue – for good reason – that even if

Uber is a car service, as alleged, Deresse's driving is not its regular work.

This leaves the fourth and "determinative" factor: whether Uber controlled Deresse's

day-to-day operations or merely exercised general supervision over his activities.  Uber contends

that an entity that monitors, evaluates, and improves the results of a worker's performance is not

necessarily an employer.  See Mot. at 7; see also N. Am. Van Lines, Inc. v. NLRB, 869 F.2d

596, 599 (D.C. Cir. 1989) (company may maintain "global oversight" over an independent

contractor without exercising the control of an employer).  In Uber's view, the "specific

requirements" cited by Plaintiff indicate such global oversight but "are not indicia of an

employer-employee relationship."  Mot. at 8.

Uber is correct that "the right to inspect [and] the right to set standards" are not

necessarily "indicia of control," but may be "indicative of a contractual relationship" between an

employer and independent contractor.  <u>Giles v. Shell Oil Corp.</u>, 487 A.2d 610, 613 (D.C. 1985).

However, "the parties' <u>actual</u> relationship, in spite of contractual language, may be the

conclusive factor."  <u>Id.</u> (emphasis added).

 The District of Columbia Court of Appeals' opinion in <u>Schecter</u> is instructive for this

issue.  The court there examined a number of facts in determining whether a home deliveryman

who stole jewelry and other valuables from a customer was employed by the delivery company

for which he worked.  The company made most decisions as to the routes, deliveries, clothing,

and morning start times of the deliveryman, accommodating some route preferences but "not

relinquishing control" over routes.  <u>Schecter</u>, 892 A.2d at 425.  Like Uber drivers, the

deliverymen enjoyed a "right to decline any" delivery requests, but only up to a point, for the

retail chain could mandate some deliveries.  <u>Id.</u>  And, like Uber drivers, deliverymen were

granted some flexibility with regard to timeliness; the delivery company afforded them delivery

windows, but it measured their performance based on timely deliveries and terminated those

whose performance was unsatisfactory.  <u>Id.</u>  Effectively, the delivery company "controlled in

some detail the manner in which a driver made each delivery."  <u>Id.</u> at 426.  Based on these facts,

the court concluded, "An impartial juror could reasonably find" that the delivery company placed

"substantial limitation[s] upon the independence of those who wished to make deliveries" for the

company, "consistent with their being servants or employees, rather than independent

contractors."  <u>Id.</u>  For that reason, the court reversed the trial court's directed verdict for the

defendant.

 Here, Plaintiff has alleged that Uber controls the rate of refusal of ride requests, the

timeliness of the drivers' responses to requests, the display on vehicles of its logo, the frequency

with which drivers may contact passengers, the drivers' interactions with passengers (including

how they accept tips and collect fares), and the quality of drivers via its rating system.  <u>See</u>

Am. Compl., ¶¶ 15, 8.  Taking these allegations as true, a reasonable factfinder could conclude

that Uber exercised control over Deresse in a manner evincing an employer-employee

relationship.

In its Reply, Uber devotes considerable energy to an examination of an unpublished case

in this district, <u>Ames v. Yellow Cab of D.C.</u>, No. 00-3116, 2006 WL 2711546 (D.D.C. Sept. 21,

2006), which it believes is on all fours with this one.  In that case, the court held that Yellow Cab

operated a scheme to license its name and logo, not a cab service, and that individual cab drivers

were not its employees; consequently, the court granted summary judgment to Yellow Cab on

the *respondeat superior* claim.  <u>See</u> <u>id.</u> at *7.  But the facts of that case differ considerably from

those alleged in this Complaint: Yellow Cab could not terminate any of its employees but could

only cancel the licensing arrangement; Yellow Cab did not set a driver's fares; Yellow Cab did

not pay its drivers wages or any other form of compensation; Yellow Cab did not require cab

drivers to acquire rides through its dispatch service at all, meaning that it had no limits on a

driver's refusal rate; Yellow Cab did not impose other restrictions on drivers' interactions with

their passengers (*i.e.*, relating to tipping or cash payments); and Yellow Cab did not "hire the

drivers," but rather set minimum requirements for licensees of its logo and name.  <u>See</u> <u>id.</u> at *4-

7.  Given the particular conditions of Uber's arrangement with its drivers, as presented by

Search, the Court does not find <u>Ames</u> to dictate the same result, even if this Court were bound to

follow it.  In sum, the Court cannot determine as a matter of law that Deresse was an independent

contractor.

2.   *Scope of Employment*

Even if the Court does determine that an employer-employee relationship may exist between Deresse and Uber, Defendant contends that it is nevertheless not liable for his alleged assault on Search, as the stabbing occurred outside the scope of his employment.  See Mot. at 9. If an employee's conduct "is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve" his employer, that conduct falls outside the scope of employment.  See District of Columbia v. Coron, 515 A.2d 435, 437 (D.C. 1986).  In taking such a position, Uber points to Penn Cent. Transp. Co. v. Reddick, 398 A.2d 27 (D.C. 1979), in which the court determined that an assault committed by a railroad employee was not within the scope of his employment because it "was in no sense, either wholly or partially in furtherance of [the employer's] business."  Id. at 32.  Defendant relies also on Boykin v. District of Columbia, 484 A.2d 560 (D.C. 1984), in which the court held that a sexual assault by an employee of D.C. public schools fell outside the scope of the assailant's employment, as it was not the result of any effort to advance his employer's aims.

Uber appears to believe that "a violent attack . . . could not conceivably be one of a limousine driver's job duties," and it is therefore always outside the scope of his employment. See Mot. at 10.  But the "scope of employment" inquiry in the District of Columbia is not as narrow as Defendant would like to imagine.  In fact, if "there is evidence that the assault grew out of a job-related controversy," an assault may very well fall within the scope of the perpetrator's employment.  See Hechinger Co. v. Johnson, 761 A.2d 15, 25 (D.C. 2000).  In Johnson, a cashier at a lumber store assaulted a customer, and because testimony indicated that "the incident was precipitated by a discussion concerning some scraps of wood" that led to an argument about paying for the wood, the court determined that it would be "reasonable for the

jury to conclude that the [employee's] actions were motivated by a desire to require [the customer] to pay for the wood which he presumed to be the property of his employer" or "to conclude that the employee acted on behalf of his employer to resolve a job-related dispute."  Id. Thus, where the employee "acted, at least partially," to serve his employer's interests, a physical altercation with a customer may still fall within the requisite "scope" of employment.  See id. Accord Murphy v. Army Distaff Found., Inc., 458 A.2d 61, 63 (D.C. 1983) (when "there is some indication that the shooting [by a gardener of a trespasser] was the outgrowth of a job related encounter," court could not conclude that, as a matter of law, gardener's employer was not vicariously liable) (emphasis added); see also Lyon v. Carey, 533 F.2d 649, 651-52 (D.C. Cir. 1976) (question whether deliveryman's rape and knifing of customer was within scope of employment turned on whether rape was direct outgrowth of transaction-related dispute and should go to jury).

Here, Plaintiff has alleged facts suggesting that the dispute giving rise to Deresse's attack grew out of an encounter related to Uber's business.  According to the Complaint, the disagreement "arose out of the business transaction that brought Mr. Search to Defendant Deresse's Uber car, and it was triggered by a dispute over the conduct of Uber's business (providing car service)."  Am. Compl., ¶ 21.  This is sufficient to survive a 12(b)(6) motion; Plaintiff need not disclose additional details about the content of the dispute at this stage.  The fact that the attack was carried out after Search exited Deresse's vehicle, moreover, does not absolve Uber of liability.  Plaintiff asserts that his presence in the vehicle was a direct result of Uber's business, and that the tension that led to his assault began only after he "boarded the Uber car."  Id., ¶ 18.  Further, he states that Deresse assaulted him immediately after he left Deresse's car – not hours or days later – hence not so far in time or space from the business transaction as

to cut off Uber's liability.  See Coron, 515 A.2d at 437.  "Scope of employment is ordinarily a question for the jury," Doe v. Sipper, 821 F. Supp. 2d 384, 388 (D.D.C. 2011), and here the Court cannot conclude that, as a matter of law, Deresse's alleged stabbing was an act outside such employment.

    D.  Count V: Apparent Agency

    Even if Deresse and Uber are not bound by an actual employer-employee relationship, Plaintiff argues in the alternative that Uber represented to customers, including Search, that its drivers were its agents, and that it screened and managed them accordingly.  See Am. Compl., ¶¶ 50-53.  The District of Columbia recognizes "apparent authority" as a basis for imputing liability for the tortious acts of independent contractors to those who hired them "when the principal places the agent in such a position as to mislead third persons into believing that the agent is clothed with the authority which in fact he does not possess."  Makins v. District of Columbia, 861 A.2d 590, 594 (D.C. 2004).  Apparent authority "depends upon the third-party's perception of the agent's authority," which "may be based upon written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on her behalf" by the apparent agent.  Id. (internal quotation marks and citations omitted).  An inquiry into the existence of such authority operates something like the hoary legal principle known as the "duck test":  "[I]f it walks like a duck, swims like a duck, and quacks like a duck, it's a duck."  Lake v. Neal, 585 F.3d 1059, 1059 (7th Cir. 2009).  The doctrine, at bottom, "prevents [Defendant] from denying any liability for the torts of its independent contractors while it profits from the image and good will created by the

company's general business reputation."  Wilson v. Good Humor Corp., 757 F.2d 1293, 1302

(D.C. Cir. 1985).

      Search alleges that Uber, "[t]hrough several forms of media" such as its mobile app and

its website, represented to customers that it is "your private driver," "that it subjects its drivers to

rigorous screening procedures" before hiring them, and that it "continues to monitor" those

drivers after they are hired.  See Am. Compl., ¶¶ 6-8.  Uber responds that it "could not have been

clearer that Mr. Deresse was not its agent, and it was unreasonable for Plaintiff to believe"

otherwise.  See Mot. at 13.  For this rebuttal, however, Uber relies entirely on its User

Agreement, in which it "included an exculpatory provision whereby Uber clearly, unequivocally

and specifically stated that Mr. Deresse was not [its] agent."  Id.  The parties spill considerable

ink over the meaning and effect of the User Agreement and on how it was perceived by Uber

customers.  Yet, whatever its exculpatory effect, the User Agreement is material outside the

Complaint, offered to disprove the facts as alleged therein, and the Court thus cannot consider it

in resolving the 12(b)(6) motion at hand.

      Uber nonetheless asks the Court to take judicial notice of the User Agreement because it

"is found on Uber's website," and "its accuracy cannot be reasonably questioned."  Mot. at 8 n.2

(citing Fed. R. Evid. 201(b)).  But the Court is concerned that the document's accuracy can

reasonably be questioned:  For example, Uber has not established that the User Agreement on its

website at the time of the filing of its Motion was identical to the Agreement to which Search

consented when he downloaded the Uber app.  Uber furthermore asks the Court to do more than

simply take notice of the fact that the User Agreement exists on Uber's website; Uber also

requests that the Court interpret and apply its terms to refute Plaintiff's allegations.  This request

is beyond the scope of Rule 201(b).  See, e.g., Nat'l Org. for Women, Washington, D.C. Chapter

v. Soc. Sec. Admin. of Dep't of Health & Human Servs., 736 F.2d 727, 738 n.95  (D.C. Cir.

1984) (explaining that a concept "at the heart of Fed. R. Evid. 201" is that "[f]acts pertaining to

the parties and their businesses and activities . . . are intrinsically the kind of facts that ordinarily

ought not to be determined without giving the parties a chance to know and to meet any evidence

that may be unfavorable to them") (quoting 2 K. Davis, Administrative Law Treatise, § 12:3 at

413 (2d ed. 1979)).  Because the Court is not required to take judicial notice of any adjudicative

fact, and because it believes that Uber failed to supply "the necessary information" to establish

the accuracy of any facts outside the Complaint, the Court declines to take notice of them here.

See Fed. R. Evid. 201(c).

Because a district court cannot "look[] outside the complaint to factual matters" without

converting the motion to dismiss into one for summary judgment, Marshall Cnty. Health Care

Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993), the Court declines to consider Uber's

User Agreement and its evidence purportedly contradicting the allegations in the Complaint.

And because Defendant provides no other basis for dismissing Plaintiff's apparent-agency theory

of liability, the Court will allow that count to move forward.

E.  Count VI: D.C. Consumer Protection Procedures Act

In addition to common-law negligence and vicarious-liability theories, Search also

advances a cause of action under the D.C. Consumer Protection Procedures Act.  That Act

prohibits misleading or deceiving a consumer by "represent[ing] that goods or services have a . .

. sponsorship, approval, certification, . . . that they do not have"; "represent[ing] that goods or

services are of [a] particular standard [or] quality . . . if in fact they are of another"; and

"misrepresent[ing] . . . a material fact which has a tendency to mislead."  D.C. Code §§ 28-

3904(a)-(e).  Any consumer may file suit "seeking relief from the use of a trade practice in

violation of" these provisions.  Id. § 28-3905(k)(1)(A).  Search complains that Uber "repeatedly represented to the consumer public, including specifically to Plaintiff, that its drivers were rigorously screened in order to ensure that they would not pose a danger to passengers," but that Uber failed to conduct such screenings.  See Am. Compl., ¶¶ 56-57.

In its Motion, Uber's response is three-fold.  First, the company believes it "delivered the service which it promised to Plaintiff" by connecting Search to Deresse via its technology.  See Mot. at 15.  Plaintiff retorts that Uber "did not promise consumers nothing more than a warm body driving a car."  Opp. at 25.  Ultimately, though, whether the service Uber provides is simply "connect[ing] Plaintiff to a driver," Mot. at 15, or something more is a factual dispute, as is the question whether Uber represented to customers that its sole service would be this connection.  Uber's response is unavailing at this stage, where the Court must take Search's factual allegations as true.

Second, Uber maintains that Plaintiff never alleges that it did not perform a "background screening" of Deresse or that doing so "would have disclosed that he was a danger to passengers."  Id.  On the contrary, Plaintiff did allege that "Uber failed to conduct thorough screenings of its drivers (either up-front background investigations or on a continuing basis), including specifically of Defendant Deresse."  Am. Compl., ¶ 57.  That allegation is sufficient to state a claim under the CPPA.  This statute, unlike Plaintiff's negligent-hiring claim, does not require Search to allege that, had Uber performed a background investigation, it would have unearthed information alerting it to Deresse's dangerous personality.  Under the Act, he need only allege that Defendant misrepresented a material fact that has a tendency to mislead, Plaintiff relied on that misrepresentation, and he suffered damages as a result.  Search has done so here. See Beck v. Test Masters Educ. Servs., Inc., 994 F. Supp. 2d 90, 96 (D.D.C. 2013) ("[T]he thrust

of the D.C. CPPA is much more liberal than common law fraud claims – no proof of intent is required by the alleging party.  Plaintiff must only establish that defendant made a misrepresentation – affirmative or <u>implied</u> – to prevail.").

Finally, Uber relies once again on its User Agreement, this time for the proposition that it did not represent to passengers that its "service or application will meet [their] requirements or expectations" and that it made "no representation, warranty, or guaranty as to the reliability, safety, . . . quality, [or] suitability . . . of any services, products or goods obtained by third parties through the use of the service or application."  Mot. at 16 (quoting User Agreement).  In light of this disclaimer, Uber argues, no reasonable person would have relied on "any statements in advertisements or other promotional material which Plaintiff deems made contrary representations[,] as they were commercial puffery."  Reply at 15.

But the Court must disregard this last argument, as it relies on material outside the Complaint – again, Uber's User Agreement – to refute the facts alleged therein.  The Court must instead assume that, as Search alleged, Uber misrepresented that its drivers were safe and that a reasonable consumer would rely on those misrepresentations.  Uber's Motion as to the CPPA claim will thus be denied.[1]

F.   <u>Count VIII: Gross Negligence and Punitive Damages</u>

The final count in Plaintiff's Amended Complaint asserts that "Uber's actions and/or omissions were performed with evil motive, recklessness, actual malice, with intent to injure,

---

[1] The Court notes that, in its Reply, Defendant argues for the first time that Plaintiff seeks to recover for personal injuries in Count VI, and that "the CPPA does not allow recovery for personal injuries of a tortious nature."  Reply at 16 (quoting <u>McGaughey v. District of Columbia</u>, 740 F. Supp. 2d 23, 26 (D.D.C. 2010)).  But Search does not seek relief for personal injuries under the CPPA; rather, in Count VI he seeks relief only under the Act's private-enforcement mechanism, whereby individuals may be awarded enumerated treble damages, attorney fees, punitive damages, limited restitution, or injunctive relief, if a business is found to have engaged in a trade practice that violates the Act.  <u>See</u> D.C. Code § 28-3905(k).  Plaintiff does not appear to seek additional relief for personal injuries under the CPPA.

and/or in willful disregard for the rights of Plaintiff," such that these acts "constitute gross negligence." Am. Compl., ¶ 67.  As a result of Uber's "willful and wanton disregard of Plaintiff's safety," Search also contends that "an award of punitive damages . . . to punish Defendant" would be appropriate.  Id., ¶ 69.

In the District of Columbia, "courts have traditionally analyzed whether a defendant acted with gross negligence only in limited circumstances where gross negligence is a specific element of a claim or defense, or for equitable reasons." Hernandez v. District of Columbia, 845 F. Supp. 2d 112, 116 (D.D.C. 2012) (internal citations omitted).  Generally, where plaintiff "has already alleged a negligence claim . . . the Court defers to the general rule in the District of Columbia against recognizing degrees of negligence and will dismiss as duplicative plaintiff's claim for gross negligence . . . as a separate basis of liability." Id.  That is the case here.  The Complaint includes multiple counts of negligence against Uber (i.e., Counts I, IV, V), and Search does not identify any relevant statutory claim or defense requiring a showing of gross negligence.  See, e.g., District of Columbia v. Walker, 689 A.2d 40, 44-45 (D.C. 1997) (interpreting D.C. statute with separate definitions for gross and ordinary negligence).  Plaintiff thus cannot look to D.C. law for a separate cause of action for gross negligence.

Nor does D.C. law furnish Plaintiff with a stand-alone cause of action for "punitive damages."  Rather, such damages are available only as a remedy – and, even then, only in rare circumstances.  See Gharib v. Wolf, 518 F. Supp. 2d 50, 56 (D.D.C. 2007) (dismissing "punitive damages" count because "punitive damages is a remedy and not a freestanding cause of action"); see also International Kitchen Exhaust Cleaning Ass'n v. Power Washers of N. Am., 81 F. Supp. 2d 70, 74 (D.D.C. 2000) (dismissing "punitive damages" count where it was "mispleaded . . . as a free-standing cause of action," but "declin[ing] to rule on whether [that plaintiff] may recover

punitive damages as a remedy" until "a later time in the proceedings").  Search may not, therefore, allege a separate cause of action for punitive damages, but he may be able to recover such damages down the road.  The Court need not rule on their availability at this time.

Because neither "gross negligence" nor "punitive damages" is a stand-alone cause of action in the District of Columbia, the Court will grant Defendant's Motion as to Count VIII.

## IV.      Conclusion

For the foregoing reasons, the Court will grant Uber's Motion to Dismiss as to Counts I and VIII – though Plaintiff may be able to seek punitive damages at the remedial stage of the proceedings – and deny it as to Counts IV, V and VI.  The Court will issue a contemporaneous Order to that effect.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  September 10, 2015

23